

FILED

FEB 0 8 2018

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ___ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON THEODORE NELSON, | Case No.: 3:17-cv-00614-AJB-KSC |
| Plaintiff, | **REPORT AND RECOMMENDATION RE CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| NANCY A. BERRYHILL, Officially as Acting Commissioner of the Social Security Administration, | |
| Defendant. | **[Doc. Nos. 13, 14]** |

Pursuant to Title 42, United States Code, Section 405(g), of the Social Security Act ("SSA"), plaintiff filed a Complaint to obtain judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying his disability insurance benefits.[1] Pursuant to Title 28, United States Code, Section 636(b)(1)(B), and Civil Local

---

[1] Title 42, United States Code, Section 405(g), provides as follows: "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party ... may obtain a review of such decision by a civil action ... brought in the district court of the United States.... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive."

1

1 Rules 72.1(c)(1)(c) and 72.2(a), this matter was assigned to the undersigned Magistrate
2 Judge for a Report and Recommendation.

3       Presently before the Court are: (1) plaintiff's Motion for Summary Judgment [Doc.
4 No. 13]; (2) defendant's Cross-Motion for Summary Judgment [Doc. No. 14];
5 (3) defendant's Response in Opposition to plaintiff's Motion [Doc. No. 15]; (4) plaintiff's
6 Reply to defendant's Opposition [Doc. No. 16]; and (5) the Administrative Record [Doc.
7 No. 10]. After careful consideration of the moving and opposing papers, as well as the
8 Administrative Record and the applicable law, this Court **RECOMMENDS** that the
9 District Court **REMAND** the case for further consideration by the Commissioner.

10 **I.**   **BACKGROUND AND PROCEDURAL HISTORY**

11       On September 4, 2015, plaintiff filed an application for a period of disability and
12 disability insurance benefits ("DIB") alleging disability beginning August 4, 2014. [AR
13 67]. Plaintiff's application states that he was born on February 13, 1989. [*Id.*]. He
14 represents in his application that he was unable to work due to (1) chronic back pain; (2)
15 scoliosis; (3) depression; and, (4) arthritis. [AR 67]. On November 10, 2015, the
16 Commissioner denied plaintiff's application for DIB. [AR 92-94].

17       plaintiff requested reconsideration on December 7, 2015 [AR 77], alleging a change
18 in his medical condition, and listing the following: (1) "recent suicide attempt due to an
19 overdose"; (2) increase in frequency of suicidal thoughts; (3) increase in pain and decreased
20 ability to complete daily physical activities; (4) use of a cane; (5) visual hallucinations; (6)
21 PTSD; and, (7) anxiety. [AR 78]. His request was denied on January 28, 2016. [AR 104].

22       On March 30, 2016, he requested a hearing before an administrative law judge
23 (hereinafter "ALJ"). [AR 121-122]. He received notice of the hearing on August 3, 2016.
24 [AR 157-161]. A hearing before an ALJ was held on September 8, 2016. [AR 13].

25       On December 27, 2016, the ALJ issued a written opinion concluding that plaintiff
26 did not qualify for DIB under the SSA. [AR 15]. In reaching this decision, the ALJ found
27 that plaintiff has the severe impairments of "degenerative disc disease of the lumbar spine,
28 scoliosis, a major depressive disorder, and an anxiety disorder with psychosis." [AR 15].

1  However, the ALJ concluded he did not have an impairment or combination of

2  impairments that meet SSA disability criteria, and that he possesses the residual functional

3  capacity to perform unskilled sedentary work with eleven additional limitations. [AR 17-

4  18]. Plaintiff sought review from the Appeals Council, which was denied on February 28,

5  2017 [AR 1], after which he filed the instant action on March 28, 2017. [Doc. No. 1].

6  ## II.   STANDARDS OF REVIEW

7       The final decision of the Commissioner must be affirmed if it is supported by

8  substantial evidence and if the Commissioner has applied the correct legal standards.

9  *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).

10  Under the substantial evidence standard, the Commissioner's findings are upheld if

11  supported by inferences reasonably drawn from the record. *Id.* If there is evidence in the

12  record to support more than one rational interpretation, the District Court must defer to the

13  Commissioner's decision. *Id.* Substantial evidence means "such relevant evidence as a

14  reasonable mind might accept as adequate to support a conclusion." *Osenbrock v. Apfel*,

15  240 F.3d 1157, 1162 (9th Cir. 2001). The Court must weigh both the evidence that supports

16  and detracts from the administrative ruling. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir.

17  1999).

18       Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary

19  judgment if the movant shows that there is no genuine dispute as to any material fact and

20  the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "Summary

21  judgment motions, as defined by Fed.R.Civ.P. 56, contemplate the use of evidentiary

22  material in the form of affidavits, depositions, answers to interrogatories, and admissions.

23  In Social Security appeals, however, the Court may 'look no further than the pleadings and

24  the transcript of the record before the agency,' and may not admit additional evidence.

25  *Morton v. Califano*, 481 F.Supp. 908, 914 n. 2 (E.D. Tenn. 1978); 42 U.S.C. § 405(g).

26  "[A]lthough summary judgment motions are customarily used [in social security cases],

27  and even requested by the Court, such motions merely serve as vehicles for briefing the

28

1  parties' positions, and are not a prerequisite to the Court's reaching a decision on the
2  merits." *Kenney v. Heckler*, 577 F.Supp. 214, 216 (D.C. Ohio 1983).

3  ## III. MEDICAL EVIDENCE

4  ### A. *Chronological Summary of Medical Records*

5      Medical records submitted in support of plaintiff's claim for disability benefits
6  include medical notes and reports from his treating physicians at emergency rooms and
7  health clinics. The following is a brief summary of the relevant medical records pertaining
8  to plaintiff's physical ailments and mental impairments.

9      Prior to moving to San Diego in 2014, plaintiff resided in North Carolina where he
10 was a patient at the Mahec Family Health Center. His medical records at the Mahec Center
11 date back to September, 2013. [AR 319-321]. On September 13 and 16, 2013, treating
12 physician, Dr. Samantha Fawcett, recorded that plaintiff stated he struggled with "ongoing
13 back pain" that "look[ed] like [a] compressed disc" for which he occasionally took "5MG
14 APAP, flexeril, +/- skelaxin, [and] naproxen." [AR 319]. Though he was observed to have
15 a "full affect," Dr. Fawcett also observed psychiatric symptoms of fearfulness and anxiety.
16 [AR 320]. During a visit on November 13, 2013, another physician recorded that plaintiff
17 complained of pain in his joints/bones. [AR 318]. Subsequent visits on March 3, April 21,
18 and May 19 of 2014 all dealt with apparent sexual activity problems, which one physician
19 noted was likely "psychosocial." [AR 311-318]. On June 18, 2014, plaintiff's treating
20 physician, Dr. Aaron Vaughn, recorded that plaintiff had a flat affect. [AR 308].

21      On February 3, 2015, plaintiff was hospitalized at WakeMed Cary Hospital after
22 attempting to commit suicide by ingesting multiple Benadryl pills and alcohol. [AR 327].
23 During his six-day stay, the psychiatric consulting physician wrote that plaintiff had felt
24 depressed for 1-2 years, was uncooperative during the assessment, and refused to answer
25 questions. [*Id.*]. The psychiatrist also recorded that plaintiff had previously been treated
26 for depression when he was sixteen. [AR 328]. The discharge evaluation stated that during
27 his hospitalization, he did not "agree[] to tak[e] any medications recommended by
28 psychiatry to treat his depression." [AR 326]. On February 9, 2015, plaintiff was released

4

from WakeMed hospital to Holly Hill Hospital where he stayed for eleven days. [AR 472]. Dr. Jonathan Ahr conducted an evaluation during his time at Holly Hill and reported that "[t]he test data do suggest a major depressive disorder . . ." and that he "may be expressing paranoid personality traits in these test data as well." [AR 482]. Though safe for discharge with appropriate aftercare, Dr. Ahr concluded that "[o]wing to the severity of his attempt, the patient must be considered with chronic suicide risk." [*Id.*] Upon discharge, the summary of his stay at Holly Hill Hospital contained, *inter alia*, the following findings: "major depressive disorder[,] severe and recurrent"; plaintiff "felt much better on [20mg of Paxil]"; and was "improving on these medications"; and he felt much better on the medications and was eager to move forward in a positive manner. [AR 472].

On June 8, 2015, plaintiff went to San Ysidro Health Center where he began treatment for back pain, depression, and scoliosis. [AR 517-520]. The records from his June 8, 2015 visit note symptoms of depression, anxiety, and gait disturbance. [AR 518]. He was prescribed Paxil, Naproxen, and Flexeril. [AR 517].

On June 26, 2015, plaintiff returned to the San Ysidro Health Center seeking a "behavioral health visit." [AR 513]. During that visit, the medical records show plaintiff suffered from anxiety, depression, gait disturbance, insomnia, back pain, and joint pain. [AR 514]. His existing prescriptions from the June 8, 2015 visit did not change, however the treating physician, Dr. Sean Rodriguez, also prescribed 300 milligrams of Gabapentin. [AR 513]. Plaintiff returned to the Health Center on July 2, 2015 for an injection of Toradol to address his chronic back pain. [AR 507]. However, he refused the injection on that date because he could not receive local anesthetic prior to the injection. [*Id.*]. Instead, Dr. Rodrigquez increased the regular dose of Gabapentin from 300 milligrams to 600 milligrams to be taken at night. [*Id.*].

Plaintiff was also incarcerated at the San Diego County Jail on July 8, 2015. [AR 485]. Following his initial evaluation, the "encounter notes" stated plaintiff was a risk for violence to himself, to others, and that he showed signs of "[a]lteration in thought process" and "[a]lteration in mood." [AR 488]. For two days, he was placed on suicide watch. [*Id.*].

During that time, he was placed in a safety garment and suicide precaution blanket. [AR 485-87]. No "self-harming gestures" or suicidal statements were observed during the two-day period. [*Id.*]. He consistently denied having suicidal thoughts when asked. [*Id.*].

Plaintiff returned to San Ysidro Health Center on August 17, 2015 where he reported similar symptoms to his prior visit, but an added symptom of hearing loss in both ears. [AR 502]. He was prescribed a cane to assist him when walking and his previous prescriptions were refilled. [AR 502-06].

Plaintiff filed his SSI and SSDI appeal on September 4, 2015 in which he stated, *inter alia*, "I am seeing visual hallucinations and my paranoia is extremely bad. I am constantly in fear that someone is trying to harm me or kill me." [AR 250].

Plaintiff began regular treatment at St. Vincent de Paul Family Health Center ("SDVP") on September 14, 2015. [AR 595]. At his first visit, he exhibited clear signs of depression, but upon questioning, denied any psychosis or that he experienced hallucinations. [AR 595]. Between September 14, 2015 and November 18, 2015, plaintiff had seven appointments at SDVP. [AR 565-74]. He failed to show up for three of those seven appointments. [AR 565, 570, 575]. At the appointments he did attend, physicians noted that he presented with symptoms of depression [AR 571, 572, 567] and/or mild anxiety [AR 566]. At a psychiatric appointment on October 26, 2015, plaintiff explained he had gained twenty pounds and the treating physician, Dr. Donald Ferris, observed paranoid ideation (namely, a belief that the police and district attorney were "out to get him"), delusions, and poor judgment. [AR 593]. However, Dr. Ferris did not note in the medical records that plaintiff suffered from either auditory or visual hallucinations. [*Id.*]. Dr. Ferris assigned plaintiff a Global Assessment of Functioning[2] score of 50.

---

[2] GAF is a scale reflecting the 'psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness.' Diagnostic and Statistical Manual of Mental Disorders at 34 (4th ed. 2000) ("DSM IV–TR"). A 41–50 rating indicates serious symptoms such as suicidal ideation, severe obsessional rituals, or serious impairment in social, work, or school functioning." *Koerner v. Astrue*, 2011 WL 221440, at *3 (E.D. Cal. Jan. 21, 2011) (internal citations omitted).

On November 19 and 20, 2015, plaintiff was hospitalized at UCSD Medical Center for a second suicide attempt. [AR 533]. The emergency room records document that he presented with symptoms of an "intentional overdose, [and] state[d] he took 42 1 [milligram] clonazepam around 6PM and 3 flexeril." [AR 533]. The psychiatry consult note states that he "self-reported [a] history of PTSD, anxiety and [a] prior suicide attempt." [AR 535]. Following his hospitalization, plaintiff returned to SVDP on November 25, 2015 for a psychiatric appointment with Behavioral Health Program Manager, Megan Partch. [AR 586]. Ms. Partch observed plaintiff's struggle to sit for moderate periods of time without substantial discomfort, and that he "presented as depressed" and "displayed a flat affect." [Id.]. Michael Patton at SDVP also met with plaintiff and noted he was a patient with a high level of need and that it was important, despite not appearing to be a danger to himself or others at that time, he "engage in [mental health services]." [AR 587].

Between November 25, 2015 and January 20, 2016, plaintiff had nine scheduled appointments, seven of which he either cancelled or failed to attend. [AR 552, 553, 559, 560, 561, 562, 563]. At a December 14, 2015 appointment, plaintiff explained he wanted "to get off paxil and all drugs", but was advised not to do so given his recent suicidal feelings. [AR 584].

On February 29, 2016, plaintiff went to the UC San Diego Health Emergency Room due to a fall. [AR 696]. He was given pain medication for the back pain and was advised to follow up with his primary care provider. [Id.]. In the "Nursing Triage Note", plaintiff stated he had been suffering from photophobia since December of 2015 and that he had not seen a psychiatrist recently because "they refuse to see him with his glasses on." [AR 697]. This is the first mention this Court can identify in the record of plaintiff's photophobic condition, and of plaintiff's belief he was refused treatment, presumably at SDVP.

Plaintiff returned to the UC San Diego Health Emergency Room on March 4, 2016 for continued pain from his reported fall on February 29, 2016. [AR 704]. His pain had lessened by 20%, however, he still rated his overall discomfort at a 7/10. [Id.]. He stated he suffered from anxiety, struggled with problem solving, falling asleep, and staying

7

asleep. [*Id.*]. Physical therapy was recommended and no changes were made to his existing prescriptions. [AR 705].

On June 2, 2016, plaintiff went to the San Ysidro Health Clinic due to fainting and blackouts. [AR 611]. The treating physician observed delayed speech and a right facial twitch. [*Id.*]. Plaintiff explained that witnesses told him when he blacks out while walking, for example, that occasionally he exhibits seizure-like symptoms that he does not remember. [*Id.*]. He was therefore referred to a neurologist for a CAT scan. [AR 613].

Plaintiff returned to the San Ysidro Health Center on June 15, 2016 and was treated by Dr. Brendan Kidder. [AR 608]. Plaintiff's "stated medical condition limiting work status" was "schizophrenia." [*Id.*]. Plaintiff was "obviously confused and intermittently disoriented" and "refuse[d] to go into room [two] because he was 'told not to.'" [*Id.*]. He explained that he had schizophrenia, but was out of his prescribed medication and had been for "some time." [*Id.*]. Though no suicidal ideation was present, Dr. Kidder noted the following: "not oriented to situation"; "[a]gitation"; "[i]nappropriate mood and affect – irritable"; "[p]atient is in denial"; "[f]light of ideas"; "[f]orgetful"; "[h]allucinations – auditory"; "[p]aranoia"; "[p]oor insight"; and "[p]oor judgment". [AR 609].

From May 17, 2016 to June 6, 2017, plaintiff was treated at the Jane Westin Center for "unspecified psychosis not due to a substance or known physiological condition." [AR 671]. Plaintiff was prescribed Latuda and Zyprexa, but no other treating notes are in the administrative record filed with the Court. [*Id.*].

## IV.    THE ALJ'S FIVE-STEP DISABILITY ANALYSIS

To qualify for disability benefits under the SSA, an applicant must show that he or she is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last at least 12 months. 42 U.S.C. § 423(d). The Social Security regulations establish a five-step sequential evaluation for determining whether an applicant is disabled under this standard. 20 CFR § 404.1520(a); *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d at 1193-1194.

At step one, the ALJ must determine whether the applicant is engaged in substantial gainful activity. 20 CFR § 404.1520(a)(4)(I). "Substantial gainful activity is work activity that is both substantial and gainful." 20 CFR § 416.972. Here, the ALJ concluded plaintiff had not engaged in substantial gainful activity since August 4, 2014, the alleged onset date of plaintiff's impairments. [AR 15].

At step two, the ALJ must determine whether the applicant is suffering from a "severe" impairment within the meaning of Social Security regulations. 20 CFR § 404.1520(a)(4)(ii). "An impairment or combination of impairments is not severe if it does not significantly limit [the applicant's] physical or mental ability to do basic work activities." 20 CFR § 404.1521(a). For example, a slight abnormality or combination of slight abnormalities that only have a minimal effect on the applicant's ability to perform basic work activities will not be considered a "severe" impairment. *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005). Examples of basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. 20 CFR § 404.1521(b)(1)-(6). "If the ALJ finds that the claimant lacks a medically severe impairment, the ALJ must find the claimant not to be disabled." *Webb v. Barnhart*, 433 F.3d at 686.

Here, at step two, the ALJ concluded that plaintiff has the following impairments: "degenerative disc disease of the lumbar spine; scoliosis; a major depressive disorder and an anxiety disorder with psychosis."[AR 15]. The ALJ also found that these impairments "are 'severe' as defined in the Regulations." [*Id.*].

If a claimant is deemed to have severe impairments, the ALJ must then determine at step three whether any impairment equals, or rises to the level of, one of the "Listing of Impairments" in the Social Security regulations. 20 CFR § 404.1520(a)(4)(iii). If so, he or she must be found disabled. *Id.* In this case, the ALJ concluded at step three that plaintiff's impairments or combination of impairments did not meet or equal a listed impairment. [AR

16-17]. Although the ALJ considered whether plaintiff met the criteria in several of the Listings, the focus of his analysis was Listing 12.06, anxiety related disorders. [AR 17.] Currently, the requirements of Listing 12.06 for anxiety related disorders are as follows:

> A. Medically documented findings of . . . :
>
> 1.    Anxiety disorder, characterized by three or more of the following:
>
>> a.    Restlessness;
>> b.    Easily fatigued;
>> c.    Difficulty concentrating;
>> d.    Irritability;
>> e.    Muscle tension; or
>> f.    Sleep disturbance.
>
> 2.    Panic disorder or agoraphobia, characterized by one or both:
>
>> a.    Panic attacks followed by a persistent concern or worry about additional panic attacks or their consequences; or
>> b.    Disproportionate fear or anxiety about at least two different situations. . .
>
> * * * *
>
> AND
>
> B.    Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
>
> 1. Understand, remember, or apply information;
>
> 2. Interact with others;
>
> 3. Concentrate, persist, or maintain pace;
>
> 4. Adapt or manage oneself;
>
> OR

C.   Your mental disorder in this listing category is 'serious and persistent;' that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

1.   Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder; and

2.   Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.06.

The ALJ considered whether plaintiff met the criteria for "paragraph B" and concluded plaintiff did not meet the criteria because his impairments did not "cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation." [AR 17].   Similarly, the ALJ concluded plaintiff did not meet the "paragraph C" criteria because the "record does not show [plaintiff is unable] to function independently outside the home." [*Id.*].   In addition, the ALJ specifically considered plaintiff's testimony regarding his mental impairments, medical regimens, and physical ailments. [AR 19-23].  However, the ALJ reasoned that plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record." [AR 22].  The ALJ noted, in particular, "when the claimant is compliant with prescribed treatment and medication therapy, his conditions improves and his symptoms abate." [*Id.*].  The ALJ identified multiple instances of non-compliance, "which is a common theme throughout the record," but also took care to note it was only "one factor among many leading to the ultimate conclusion" in plaintiff's case. [AR 19].

If an impairment does not meet or equal a Listing, the ALJ must make a step four determination of the claimant's residual functional capacity based on all impairments, including impairments that are not severe.   20 CFR §§ 404.1520(e), 404.1545(a)(2). "Residual functional capacity" ("RFC") is "the most [an applicant] can still do despite [his or her] limitations."  20 CFR § 404.1545(a)(1). The ALJ must determine whether the

applicant retains the residual functional capacity to perform his or her past relevant work. 20 CFR § 404.1520(a)(4)(iv).

If the applicant cannot perform past relevant work, the ALJ – at step five – must consider whether the applicant can perform any other work that exists in the national economy. 20 CFR § 404.1520(a)(4)(v). While the applicant carries the burden of proving eligibility at steps one through four, the burden at step five rests on the agency. *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003). The ALJ must consider all of plaintiff's medically determinable impairments, including any pain that could "cause a limitation of function" and any impairments that were not "severe," and then determine plaintiff's residual functional capacity to perform other work in the national economy. 20 CFR §§ 404.1520; 404.1545; 416.929. "In determining [the claimant's] residual functional capacity, the ALJ must consider whether the aggregate of [the claimant's] mental and physical impairments may so incapacitate him that he is unable to perform available work." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997), as *amended on reh'g* (Sept. 17, 1997). As noted above, "residual functional capacity" is "the most [an applicant] can still do despite [his or her] limitations." 20 CFR § 404.1545(a)(1).

Here, the ALJ acknowledged at step four that plaintiff was unable to perform any past relevant work. [AR 23].

Considering the totality of plaintiff's impairments, the ALJ concluded at step five that plaintiff has the residual functional capacity to make a "successful adjustment to other work that exists in significant numbers in the national economy." [AR 24]. The ALJ considered the testimony of the vocational expert and plaintiff's age, education, work experience, and residual functional capacity. [AR 23-24]. The ALJ cited the vocational expert's testimony regarding representative occupations for plaintiff, which included two positions that met plaintiff's RFC of "unskilled, sedentary level occupations": addressing clerk, and lens inserter. [*Id.*]. The ALJ determined that 8,300 jobs in the national economy constituted a "significant number." [AR 24]. In reaching this determination, the ALJ

concluded that plaintiff is "not disabled" under the framework of Rules 216(i) and 223(d) of the Social Security Act, and accordingly denied benefits. [AR 25].

## V.  DISCUSSION

As noted above, the final decision of the Commissioner must be affirmed if it is supported by substantial evidence and if the Commissioner has applied the correct legal standards. *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). Under the substantial evidence standard, the Commissioner's findings are upheld if supported by inferences reasonably drawn from the record. *Id.* If there is evidence in the record to support more than one rational interpretation, the District Court must defer to the Commissioner's decision. *Id.* Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). A court must weigh both the evidence that supports and detracts from the administrative ruling. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

### A.  *Whether a Consultative Examination Should Have Been Ordered*

Plaintiff contends error due to the ALJ's failure to order a consultative, or "psychological", examination. [Doc. No. 13, at p. 13]. Pointing to the voluminous record, rife with "indications" that plaintiff "suffers from [ ] delusions, hallucinations, paranoia, and disorientation", he asserts there was more than enough information present to warrant an examination ordered by the ALJ. [*Id.*]. He goes on to argue "the record does not include any medical source statements from treating or examining doctors." [*Id.*]. As such, "an examining psychiatric professional would be better able and more qualified than the ALJ to evaluate the severity and degree of [plaintiff's] functional limitations [due to his] mental impairments." [*Id.*].

It is well-established than an "ALJ has a duty to assist in developing the record." *Armstrong v. Commissioner of Soc. Sec. Admin.*, 160 F.3d 587. 789 (9th Cir. 1998); *see also Sims. V. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop

13

the arguments both for and against granting benefits….").  A tool for the ALJ to develop the record is the ability to order consultative examinations, "a physical or mental examination or test purchased for [a claimant] at [the Commissioner's] request and expense." 20 C.F.R. § 404.1519. Yet, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).  Though granted broad latitude, *Reed v. Massanari,* 270 F.3d 838, 842 (9th Cir. 2001), an ALJ can make a determination of nondisability only when he has made "every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment." 42 U.S.C. 421(h).  The Commissioner need only seek additional evidence or clarification from a treating physician when a medical report contains a "conflict" or an "ambiguity" that must be resolved. 20 C.F.R. § 416.912(e)(1).

Here, the record is neither so ambiguous nor inadequate as to have necessitated a consultative examination.  The record was sufficient to allow for the ALJ's evaluation, and he considered numerous medical records from several sources, incorporating many of them into his decision. *See* AR 16-23.  Plaintiff asserts "the ALJ's duty to develop the record was triggered because the ALJ found that the record was insufficient to properly evaluate plaintiff's claim. (AR 16)." [Doc. No. 16, at p. 1].  Nowhere does the ALJ state the record was insufficient for proper evaluation.  Plaintiff mistakes the ALJ's conclusion that the record does not support a finding in plaintiff's favor as an admission that the record was insufficient to evaluate plaintiff's claim.  It does not follow that a record which does not support a decision for a claimant is *a priori* insufficient to support *any* decision.

Moreover, the medical records are not internally inconsistent such that they present a "conflict" warranting a consultative examination.  Plaintiff's own arguments demonstrate the consistent diagnosis of plaintiff's mental impairments over time. [Doc. No. 1, at p. 3] ("There are multiple indications in the record that plaintiff suffers from these delusions, hallucinations, paranoia, and disorientation. (AR 250, 252, 271, 482. 532, 533, 537, 541,

593, 608, 609, 6660, 662, 671, 680, 681, 686)).''[3]  In addition to a careful review of the administrative record, the ALJ also questioned plaintiff extensively during the hearing regarding prior treatment, the effects of his mental impairment on his day-to-day life, and the effectiveness of different treatments over time. [AR 31-66].  The ALJ also considered the evaluations by the state agency physicians [AR 67-106], and the records from plaintiff's treating physicians [AR 1F-11F].  Absent conflict or ambiguity, the ALJ's duty to develop the record was not triggered, and the ALJ did not fail to meet his burden.  *See Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

## B.  *Whether the ALJ Improperly Discounted Plaintiff's Credibility*

Plaintiff argues the ALJ's emphasis on his non-compliance with recommended medical treatments amounts to an impermissible credibility evaluation because the ALJ did not use the two-step analysis set out in *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014). [Doc. No. 1, at p. 13-14].  He argues non-compliance is not relevant to his credibility because "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." [*Id.* at p. 14] quoting *Van Nguyen v. Charter*, 100 F.3d 1462, 1465 (9th Cir. 1996).  Missed appointments or failing to take medication was not the result of malingering or laziness, plaintiff contends, but the product of his "underlying psychiatric issues." [Doc. No. 1, at p. 15].  For example, plaintiff points

---

[3] The Court also notes plaintiff's argument that "the record does not include any medical source statements from treating or examining doctors." [Doc. No. 1, at p. 13].  While such statements can be, and often are, helpful to a claimant, the Commissioner is not obligated to develop the record by securing such statements from claimant's physician(s).  In situations, as here, where a claimant does not have a regular treating physician, but rather has frequent emergency room or health clinic visits, the value of such statements is also diminished.  A review of the administrative record reveals one Treating Source Statement, which states, in pertinent part: from 5/17/16 to 6/6/17 when plaintiff received treatment at the Jane Westin Center, "[plaintiff's] mental health diagnosis was unspecified psychosis not due to a substance or known physiological condition." [AR 671].  The information from the Statement is consistent with the other medical records before the ALJ, which document plaintiff's medical, and mental health, history.  Medical source statements are not necessary for an ALJ to make his decision, and plaintiff, tellingly, provides no authority to support his proposition.  While a consultative examination might have proved useful, additional information can almost always assist a decisionmaker.  Yet under the caselaw and statutory and regulatory standards, the ALJ was not obligated to seek out such an examination in this case.

3:17-cv-00614-AJB-KSC

to his documented struggles with paranoia, which also explains his decision to stop taking his prescribed medication because of the side effects and a misguided belief that his psychiatrist did not care about said side effects. [*Id.* at p. 16]. Plaintiff further argues his medical records support his contention that his "intermittent unwillingness to take psychiatric medications in the past was related to his lack of insight into his disorder." [*Id.*]. Taken together, plaintiff asserts, the evidence on the record warranted further explication by the ALJ, and the rationales provided by the ALJ were neither clear nor convincing.

Defendant argues the ALJ's decision was supported by substantial evidence for three reasons: (1) the ALJ explained plaintiff "engaged in a wide range of activities that were inconsistent with a claim of total disability" [Doc. No. 15, at p. 7]; (2) that plaintiff frequently failed to cooperate during intake evaluations and refused treatment with psychiatric medication [*Id.* at p. 8]; and, (3) that plaintiff frequently missed appointments with treating physicians, social workers, and psychologists [*Id.*].

An ALJ must consider all of the relevant evidence in the record and may not point to only those portions of the records that bolster her findings. *See, e.g., Holohan v. Massanari*, 246 F.3d 1195, 1207-08 (9th Cir. 2001) (holding that an ALJ cannot selectively rely on some entries in plaintiff's records while ignoring others); *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir.2003) (holding that the ALJ's statement of what evidence was credible and what evidence suggested the lack of credibility sufficed as specific findings or reasons for rejecting a claimant's testimony, but holding that the mere presence of evidence in the record that would support the ALJ's conclusions, in the absence of the ALJ's discussion thereof, was insufficient). When considering the effect of medication on a claimant's well-being, it is error for an ALJ to deny a claimant benefits merely because she has shown improvement or experienced cycles of improvement. *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). An ALJ must interpret improvement in mental health issues "with an understanding of the patient's overall well-being" and "with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace." *Id.* In

analyzing an individual's overall well-being, the ALJ may consider plaintiff's daily activities, treating therapist notes, and evidence suggesting she has responded well to treatment. *Crane v. Shalala*, 76 F.3d 251, 254 (9th Cir. 1996). If an ALJ finds an impairment can be controlled with treatment or medication, the impairment cannot be considered disabling. *Warre v. Comm'r of Soc. Sec.*, 439 F.3d 1001, 1006 (9th Cir. 2006). In doing so, an ALJ should set out "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interstation thereof, and making findings."

Here, the Court agrees with plaintiff that the ALJ inappropriately discounted plaintiff's credibility in making his decision. The ALJ's conclusion that plaintiff's "allegations are not reasonably consistent with the objective medical record and all other evidence" turns primarily on the ALJ's belief that plaintiff's stated struggles were not credible. [AR 22]. Underpinning the ALJ's decision is plaintiff's "frequent lack of cooperation." [*Id.*]. The ALJ writes:

> The undersigned finds that the claimant's allegations are not reasonably consistent with the objective medical record and all other evidence. When the claimant is compliant with prescribed treatment and medication therapy, his condition improves and his symptoms abate. The claimant was treated with Paxil 20 mg and he reported he felt much better on this medication. Treatment providers indicated that plaintiff's condition was improving with prescribed medication. On discharge after the claimant's medication regiment stabilized, the claimant's condition was improved and he was cooperative, alert and oriented in three spheres. His mood was much better and his affect much higher (Exhibit 3F). Additionally, the claimant's frequently lack of cooperation is documented in the evidence. Records showed that the claimant was not very cooperative during the intake assessment and he refused to answer most questions (Exhibit 2F). Records showed that the claimant refused psychiatric medication treatment (Exhibit 4F). Treatment records also revealed that the claimant failed to cooperate when he missed appointments, and records document that, at times, the claimant was a no show and did not keep his appointments, including scheduled appointments on October 14, 2015, November 6, 25, 30, 2015, and December 7, 14, 21, 22, 2015 (Exhibit 9F/12).

Overall, the undersigned finds that the claimant could have performed the

duties of the jobs cited by the vocational expert discussed herein if he would have used his best efforts, complied with his treating physician's orders/medications, abstained from alcohol and substance abuse and otherwise obeyed the law and complied with the terms of his probation. The undersigned acknowledges that while drug and alcohol abuse exists in the evidence of record, it is not material to the findings herein.

[AR 22]. The ALJ's analysis fails for two reasons. First, the analysis does not reflect an interpretation made "with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace." *Garrison*, 750 F.3d 995, 1017 (citing *Hutsell v. Massanari*, 258 F.3d 707 (8th Cir. 2001) ("We also believe that the Commissioner erroneously relied too heavily on indications in the medical record that Hutsell was 'doing well,' because doing well for purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity"); *Scott v. Astrue*, 647 F.3d 734, 739-40 ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce, and that difference is borne out in Dr. Tate's treatment notes. Those notes show that although [the claimant] had improved with treatment, she nevertheless continued to frequently experience bouts of crying and feelings of paranoia."). Indeed, while such an inference is not inherently inappropriate, "caution . . . is especially appropriate when no doctor or other medical expert has opined, on the basis of a full review of all relevant records, that a mental health patient is capable of working . . ." *Garrison* at 1018, citing *cf. Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989) ("The ALJ's conclusion that [the claimant] was responding to treatment also does not provide a clear and convincing reason for disregarding Dr. Pettinger's opinion. No physician opined that any improvement would allow [claimant] to return to work"). Here, the ALJ repeatedly emphasized the few periods of time when plaintiff exhibited some semblance of well-being from a sustained, and previously acknowledged, severe mental impairment. Although the ALJ acknowledges plaintiff's suicide attempts [AR 22], he does not do so as part of the broader picture of plaintiff's "symptoms, course of treatment, and

bouts of remission [ ] thereby chart[ing] a course of improvement." *Garrison* at 1018. The ALJ's decision does not consider that despite recorded instances of improvement, plaintiff nonetheless ended up back in the hospital from a suicide attempt on more than one occasion. Plaintiff's inconsistent record of improvement and decline inappropriately went unaddressed by the ALJ, and should be considered on remand.

Second, and in a similar vein, the ALJ failed to address plaintiff's testimony during the hearing at which he explained the substantial challenges he faces due to his auditory hallucinations while using public transit. It is well-established that an ALJ cannot selectively rely on some entries in a claimant's record while ignoring others. *See Holohan v. Massanari*, 246 F.3d 1195, 1207-08 (9th Cir. 2001). Here, direct evidence of hallucination went unaddressed. For example, the ALJ writes that plaintiff "indicated he is able to utilize public transportation without assistance," but fails at any later point to discuss the conflicting evidence from plaintiff's testimony during the hearing. Specifically, plaintiff testified:

> [Attorney]: Okay; have a sip of water. Can you explain what you were saying about it happens all the time, but now you know?
>
> [Plaintiff]: Like I'll see, like, shapes and lines on maps, or different numbers, and colors, and they influence which direction I feel like I should go in if I'm walking on the street, or if I'm taking the bus, or things that maybe I should do in the future. And it makes me late for things all the time. And I get so frustrated I feel like I can't even do anything like I used to do.
>
> . . . .
>
> [Attorney]: At San Ysidro Health Center you received treatment for also [sic] because you hear things?
>
> [Plaintiff]: Yeah.
>
> [Attorney]: Can you tell me about that?
>
> [Plaintiff]: Sometimes – often I hear voices, and sometimes they say mean things.

[Attorney]: What kind of things?

[Plaintiff]: Sometimes they tell me to shut up, or they say things like fuck you. Sometimes they tell me that I need to get off the bus, like they're taunting me, even if I know that I'm not at the right bus stop, and I have to do it anyway. And it makes me late for my appointments, if I can go.

[Attorney]: Okay

[Plaintiff]: Sometimes I don't understand what they're saying, and it sounds like just nonsense.

. . . .

[Attorney]: How often do you hear the voices?

[Plaintiff]: Several times a day, pretty much whenever I'm in public, or whenever I'm alone and it's quiet, in the evening.

[Attorney]: Okay. Is there anything you can do to try and –

[ALJ]: If you need to stand up it's fine.

[Attorney]: Is there anything you can do to try and lessen the voices, or –

[Plaintiff]: I can listen to music. If I turn it up loud, and I get new music all the time, then it doesn't – sometimes it stops, but I feel like sometimes the music is talking to me also. But a least it takes my mind away from it.

. . . .

[Attorney]: Okay. And when was the last time that you went grocery shopping?

[Plaintiff]: Probably a week or two ago.

[Attorney]: Any problems with that particular trip?

[Plaintiff]: I ran out of food stamps.

[Attorney]: All right, so – but any problems with getting there and the [*sic*] getting back?

[Plaintiff]: Yeah, I'm constantly stressed out because whenever I'm on transit the voices come over the intercom, and tell me to do things, and sometimes I can tune them out, but most of the time I can't. And I have to get off on like every other trolley stop, and – even though I know it's pointless, but I leave the station, or sit at the station and wait for the next trolley. And it just takes me forever to do something that I know should be so simple.

[AR 41-54].

At no point does the ALJ consider plaintiff's testimony of auditory hallucinations and the difficulties they pose in his daily life. At best, the ALJ considered plaintiff's testimony and medical history in the context of hypothetical difficulties: "[t]he claimant alleged that [his physical pain and mental impairments] would cause excessive absenteeism, tardiness or early departures from work and well below average work performance." [AR 22]. Plaintiff did not testify that his auditory hallucinations *would* impede his ability to carry out basic daily tasks and to attend regularly scheduled medical appointments, but that the hallucinations *did* impede him from doing so. His testimony is important evidence that corroborates the severity of his mental impairments and shows a clear arc of paranoia and hallucinations suffered since 2015. Perhaps most relevant is the ALJ's statements that plaintiff had a history of missing appointments, which indicated his lack of cooperation and non-compliance. [AR 22]. Plaintiff's testimony offers a clear explanation for why he missed appointments that the ALJ should have considered. *See, e.g., Haynes v. Berryhill*, 2017 WL 5989178, at *8 (C.D. Cal. Nov 30, 2017) ("In this case, the ALJ completely ignored plaintiff's history of auditory hallucinations and mental health treatment, rather than fulfilling her duty to weigh and assess all relevant evidence of record."). Failing to do so is either an oversight or a misguided decision to look only at evidence that bolsters his findings. *Holohan*, 246 F.3d at 1208-08. Accordingly, this Court **RECOMMENDS** that this issue be **REMANDED** to the defendant for reconsideration of plaintiff's medical history in light of the entire record, including the testimony given by plaintiff during the September 16, 2016 hearing.

## C. *Whether 8,200 Jobs is a Significant Number of Jobs in the National Economy*

The ALJ denied disability benefits to plaintiff after finding he could perform a significant number of jobs in the national economy. [AR 24]. The Vocational Expert ("VE") testified that there were two jobs for which plaintiff was suited given his limitations. [AR 59-60]. The two jobs, addressing clerk and lens inserter, have 6,100 jobs, and 2,100 jobs available in the national economy, respectively. [*Id.*]. From this, the ALJ concluded at step five that the total number of jobs between the two positions, 8,200, was significant within the national economy. Plaintiff's counsel registered his disagreement during his closing statement during the hearing [AR 65], and raises the issue once again in his instant Motion for Summary Judgment. [Doc. No. 13].

To determine whether a claimant is disabled, an ALJ engages in a five-step sequential analysis as required under 20 C.F.R. § 404.1520(a)(4)(i)-(v). Under step five, the step at issue here, a claimant is disabled unless the Commissioner meets her burden and shows that there exists a significant number of jobs in the national economy that the claimant is capable of performing. 20 C.F.R. §§ 416.920(a)(4)(v),(g); 416.960(c); *see also Tackett v. Apfel*, 180 F.3d 1094, 1094 (9th Cir. 1999). A significant number of jobs in the "national economy" has been interpreted to mean *either* in "the region where such individual lives *or* in several regions of the country." 42 U.S.C. § 423(d)(2)(A) (emphasis added). No bright-line rule exists for what number is "significant" in the Ninth Circuit, however "a comparison to other cases is instructive." *Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012). On review, therefore, courts look to whether the job(s) suited to the claimant is available in significant numbers in either (1) the region where the claimant lives, or (2) the national economy (i.e., "several regions of the country"). If either number is deemed "significant," then the decision of the ALJ must be upheld. 42 U.S.C. § 423 (d)(2)(A).

Turning first to the availability of jobs at the national level, the Court finds that 8,200 jobs is not a significant number of jobs in the national economy. Plaintiff contends

the Ninth Circuit's ruling in *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519 (9th Cir. 2014) ought to dictate the outcome in this case. There the Court held that while 25,000 jobs in the national economy is a significant number, it was nonetheless a "close call." *Id.* at 529. Defendant looks to *Beltran v. Astrue*, 700 F.3d 386, 390 (9th Cir. 2012) in which the Court held that 1,680 national jobs in one occupation was insignificant is clearly distinguishable given, here, there are 8,200 national jobs available to plaintiff. Defendant further contends *Gutierrez* supports her position as the Court "note[d] that other circuit courts have found as few as 10,000 national jobs to be significant." [Doc. No. 15, at p. 10] (*quoting Gutierrez*, 740 F.3d at 529, *citing Johnson v. Chater*, 108 F.3d 178, 180-81 (8th Cir. 1997).[4]

In the Ninth Circuit, national job numbers lower than 25,000 are typically deemed *not* significant, consistent with the *Gutierrez* court's holding that 25,000 jobs is a "close call. 740 F.3d at 529; *see also Allino v. Colvin*, 83 F. Supp. 3d 881, 888 (N.D. Cal. 2015) (finding 3,200 jobs in the national economy not significant); *Vargas v. Colvin*, 2013 WL 6254784 (C.D. Cal. Dec. 4, 2013) (finding 5,500 jobs across several regions not significant); *Valencia v. Astrue*, 2013 WL 1209353 (N.D. Cal. March 25, 2013) (finding 14,082 jobs in the nation not significant); *Ochoa v. Colvin*, 2013 WL 4816130 at *8-9 (E.D. Cal. Sept. 6, 2013) (expressing doubt that 19,122 jobs is significant, and remanding for the ALJ reconsider the 19,122 figure in light of ambiguity in the record regarding the full scope

---

[4] The Court would note that a careful reading of *Johnson v. Chater*, 108 F.3d 178 (8th Cir. 1997) reveals, at most, an *implied* endorsement by the Eight Circuit of 10,000 jobs as nationally significant. The Eighth Circuit concluded "the Commissioner met her burden of showing that . . . there exist a significant number of jobs in the economy that the [claimant] can perform." *Id.* at 180. However, the only mention of the 10,000 job figure is when the Court quptes the vocational expert's testimony. *Id.* The legal analysis, which carries over into a footnote, focuses entirely on the "regionally available" prong of the significant number analysis. *Id.* at 180-81, n.3. The Eighth Circuit concluded that 200 available jobs in the state of Iowa was a significant number of regional jobs consistent with Eighth Circuit precedent. *Id.* at n. 3. Given the standard is disjunctive, and either a regionally or nationally significant number will suffice, the decision to address explicitly only the regional jobs number is particularly relevant. Moreover, the Ninth Circuit's mention of *Johnson* was merely to offer minor, out-of-circuit, persuasive authority in support of its holding that 25,000 jobs in the national economy was a close call, but nonetheless a significant number. However, the Court did appear to endorse the view adopted in *Johnson* in its recent decision in *Evans v. Colvin*. 672 Fed.Appx. 771, 772 (9th Cir. 2017) ("Moreover, [the *Gutierrez* Court] cited with approval [*Johnson*].").

3:17-cv-00614-AJB-KSC

of work plaintiff could perform). When national job figures twice the number at issue here are deemed not significant, this Court sees no reasonable basis to conclude 8,200 jobs in the national economy is significant.

During her testimony, the VE did not provide specific numbers regarding whether the only two jobs to which plaintiff is suited – lens inserter and addressing clerk – are available in significant numbers *regionally*. [AR 57-63]. Nor did the VE even state in general terms that the two positions were available in significant numbers regionally. [*Id.*]. If the ALJ's decision "is not supported by the record, 'the proper course . . . is to remand to the agency for additional investigation or explanation.'" *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004)). "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded. When however, a rehearing would simply delay receipt of benefits, reversal [and an award of benefits] is appropriate." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citations omitted).

Accordingly, the Court **RECOMMENDS** that the issue should be **REMANDED** for clarification by the ALJ whether the positions of lens inserter and addressing clerk are available in significant numbers regionally.

## VI. REMAND FOR FURTHER PROCEEDINGS

A District Court has discretion to remand or reverse and award benefits. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989). Where further proceedings would serve no useful purpose, or where the record is fully developed, an exercise of discretion to direct an immediate award of benefits is appropriate. *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1041 (9th Cir. 2007); *Benecke v. Barnhart*, 379 F.3d 587, 595-96 (9th Cir. 2004). Where outstanding issues must be resolved before a determination can be made and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate. *See Benecke*, 379 F.3d at 593-96.

In this case, there are outstanding issues that must be resolved before a final determination can be made. The ALJ on remand should reassess plaintiff's medical history

and subjective allegations and make his case, supported by substantial evidence in the case record, for discounting or rejecting any testimony. The ALJ should also reassess plaintiff's RFC and determine, at step five, with the assistance of a Vocational Expert, whether the two jobs for which plaintiff is capable of performing exist in significant numbers in the *regional* economy. *See Shaibi v. Berryhill*, 870 F.3d 874, 882-83 (9th Cir. Aug. 22, 2017).

## VII.   CONCLUSION

Based on the foregoing, **IT IS HEREBY RECOMMENDED THAT THE DISTRICT COURT**:

1.   **GRANT** plaintiff's Motion for Summary Judgment to the extent it seeks a remand for further administrative proceedings [Doc. No. 13];

2.   **DENY** defendant's Cross-Motion for Summary Judgment [Doc. No. 14];

3.   **REMAND** the matter to the Commissioner for further consideration, investigation, and development of the record consistent with this Report and Recommendation.

This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Civil Local Rule 72.1(d). Within ***fourteen (14) days*** after being served with a copy of this Report and Recommendation, "any party may serve and file written objections." 28 U.S.C. § 636(b)(1)(B)&(C). The document should be captioned "Objections to Report and Recommendation." The parties are advised that failure to file objections within this specific time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1156–57 (9th Cir.1991).

**IT IS SO ORDERED.**

Dated: February 7, 2018

Hon. Karen S. Crawford
United States Magistrate Judge